OPINION OF THE COURT
Sabrina B. Kraus, J.
Background
In this summary nonpayment proceeding, Irving and Neil Bender, as executors of the estate of William Gottlieb, and 220-2 West 10th Street, LLC (collectively petitioners), seek to recover possession of apartment 3B at 220 West 10th Street (subject premises), based on the allegation that Geoffrey Green and Danna Shapiro, sued herein as D. Shapiro (collectively respondents), the rent-stabilized tenants of record, have failed to pay rent for the subject premises.
Procedural History
The rent demand was issued on or about January 5, 2007 seeking $7,099.76 in rent for the period of October 2005 through January 2007. On or about January 22, 2007 a notice of petition and petition were issued for $4,228.42, the amount allegedly remaining due since the service of the demand. On or about January 31, 2007, respondents appeared herein by counsel and filed a written answer and counterclaims. The primary claim asserted by respondents is that they were not obligated to pay the full rent for the period, due to an infestation of bedbugs in the subject premises.
Immediately prior to this proceeding, another nonpayment proceeding had been pending between the parties, under index No. 101422/06, which was discontinued pursuant to a stipulation dated January 30, 2007. Both parties were represented by the same attorneys in both proceedings.
Pursuant to a stipulation dated March 6, 2007 and April 30, 2007, respondents withdrew the affirmative defense asserted in paragraph two of their answer, waived claims regarding traverse, and consented to the jurisdiction of the court.
The matter was assigned to Part S for trial on July 22, 2008, before the Honorable Peter Wendt. Based on an issue that arose *176 during the presentation of petitioners’ prima facie case, the proceeding was marked off calendar by the court. The court provided that petitioners had 60 days to move to restore the proceeding, or face dismissal.
On or about October 14, 2008, respondents moved for an order to restore the proceeding on their counterclaims and request for attorneys fees, and to deem the underlying proceeding dismissed, as per Judge Wendt’s July 22, 2008 order. Petitioners cross-moved for an order restoring the proceeding for trial.[1] On November 17, 2008 this court issued an order on the motions, excusing petitioners’ tardiness in moving to restore as de minimis, and scheduling a trial de novo on January 13, 2009.
The trial took place on January 13 and 14, 2009.
Trial
Petitioners established their prima facie case at trial. Petitioners entered into evidence a deed between William Gottlieb and 220-2 West 10th Street, LLC. The deed is dated September 30, 1997 and is for the premises known as 220-222 West 10th Street, New York, New York. Petitioners entered into evidence a certified copy of the multiple dwelling registration dated October 29, 2008, showing that the premises are registered with New York City Department of Housing Preservation and Development (HPD). Petitioners established that the legal registered rent for the subject premises is $1,435.67, and that it had been registered with the Division of Housing and Community Renewal (DHCR).
Respondents took occupancy of the subject premises pursuant to a written lease agreement dated April 1, 2004, and most recently renewed on December 15, 2005 for a one-year period through and including March 31, 2007.
The parties stipulated, at trial, that through January 2009 there were five months of rent outstanding. Two months at $1,397.25 per month, and three months at $1,435.67 per month. January 2009 rent was paid and accepted prior to the conclusion of the trial without prejudice. Thus, as of the conclusion of the trial, it was stipulated that there was unpaid rent totaling $5,665.84.
Testimony of Geoffrey Green
Mr. Green has resided in the subject premises since April 2004. Immediately prior to moving into the subject premises, *177 respondents lived in apartment 4A at 222 West 10th Street, New York, New York, an adjacent building owned by the same landlord. Respondents had a bedbug infestation when they lived in their former apartment, and they were familiar with the indications of bedbugs when they began to appear in the subject premises.
Respondents began having a problem with bedbugs in the subject premises on or about April 2005. Respondents started waking up with welts that were like insect bites. Mr. Green called management, and was provided with the number of an exterminator that petitioners kept on retainer. Mr. Green called Robert Rinaldi, from Careful Exterminating (exterminator), who came and treated the bedroom in the subject premises.
Respondents washed all of their clothing, sealed every crack and crevice in their bedroom, vacated the bedroom and began sleeping in the kitchen and living room. Respondents replaced portions of their wooden bed, had their mattress encased in plastic, and put their clothing in sealed bins. Respondents began changing their linens frequently, sometimes daily, and also vacuumed daily. Mr. Green put a notice in the lobby of the building notifying other tenants of the presence of bedbugs.
The frequency of bites experienced by respondents increased after the initial treatment by the exterminator. Throughout the summer of 2005, Mr. Green had welts on a daily basis, all over his back, legs, arms, and sometimes on his face.
Mr. Green called petitioners’ office once or twice a month, and petitioners continued to refer him to the exterminator. At no point did respondents consult with or hire their own exterminator. Ms. Shapiro stated that she had considered hiring her own exterminator, but decided against it because she knew other tenants who had hired their own exterminators and still had bedbugs.
In 2006, Mr. Green remained in touch with petitioners on a monthly basis and had a standing appointment with the exterminator. At one point respondents were provided with extermination services as frequently as twice a week.
Respondents never made written complaints to petitioners or their agents regarding bedbugs from the alleged inception of the condition in April 2005 through and including January 2007. Mr Green didn’t need to write letters to petitioners regarding the condition, because he was satisfied with the line of communication between the parties. Mr. Green had written to *178 petitioners on other occasions, prior to 2005 about other unrelated conditions.
Respondents testified that the infestation of bedbugs varied with the seasons, escalating in the spring and summer, with August typically being the worst, and then diminishing when winter set in.
Mr. Green stated that as a result of the bedbugs, the bedroom became almost unusable for sleeping. Respondents attempted to sleep with the lights on, and rotated between sleeping in the bedroom, the kitchen and the living room of the subject premises. Respondents did not use the bedroom between May and August in 2005 and 2006, and were most comfortable sleeping in the kitchen.
Mr. Green testified that from April 2005 through July 2008, he did not have a single, full night’s sleep during the summer months. Lack of sleep affected respondents’ relationship with each other, and their ability to get to work on time.
Respondents withheld two months of rent in September and October 2005. Respondents hired an attorney in January 2007. Respondents did not withhold rent for any period from October 2005 through October 2007. The problem with bedbugs abated as of November 2007.
Mr. Green offered into evidence two ziplock bags containing dead bedbugs. Exhibit D1 contained approximately 10 specimens collected at the outset of the problem, and exhibit D2 contained two bugs collected during the summer of 2007.
Mr. Green put into evidence photographs of the bites and welts that were experienced by respondents (exhibits C1-C4). Respondent was not certain as to the dates the photos were taken and could only specify it was after April 2005.
Mr. Green’s testimony on cross-examination was evasive and not entirely credible.
Testimony of Danna Shapiro
Danna Shapiro testified that the condition of bedbugs existed in the subject premises, through various degrees, from April 2005 through the end of 2007. She alleged that as a result of the bedbug condition she had to seek medical treatment twice in August 2006. Ms. Shapiro sought medical treatment at Saint Vincent’s Hospital in Manhattan on August 8, 2006, because she had pain and swelling in her left foot. Ms. Shapiro was diagnosed with cellulitis, a skin infection. She went to her *179 dermatologist for a follow-up visit on August 24, 2006. Ms. Shapiro was barely able to walk because her feet were so swollen. Respondents did not prove that the conditions which Ms. Shapiro sought treatment for were related to bedbugs.
Respondents testified that they had personally observed as many as 100 bedbugs in the subject premises from April 2005 through July 2008. Ms. Shapiro testified that, over the same period of time, she had sustained several hundred bedbug bites. Ms. Shapiro created a bite log which listed eight dates from January 2007 through July 2008 where she received one bedbug bite, and one day during the same period where she received two bedbug bites.
Ms. Shapiro testified that exhibit C3 was a photograph of a particularly bad bedbug bite on her eye, taken July 14, 2007. From 2007 forward, Ms. Shapiro received significantly less bites.
Ms. Shapiro called HPD on numerous occasions to file complaints about bedbugs. On all but one of those occasions she did not provide the inspector access to the subject premises. No documentation regarding the complaints, or the resolution of the complaints was offered into evidence by respondents. No violation for bedbugs was placed by HPD either in the subject premises or in the subject building.
Other Witnesses for Respondents
The next witness presented by respondents was Theresa Lonng. Ms. Lonng presented credible and precise testimony in all regards. Ms. Lonng resided at 222 West 10th Street, apartment 4B, and was respondents’ neighbor prior to their tenancy in the subject premises. Ms. Lonng has lived in that location since approximately 1998. Ms. Lonng had a substantial problem with bedbugs in the neighboring building which began prior to 2005. In 2005, Ms. Lonng notified HPD, and violations for bedbugs in Ms. Lonng’s apartment were placed on September 15, 2005 and October 4, 2006.
When Ms. Lonng was bitten by bedbugs, it was usually in groups of three, and the bites appeared larger than a mosquito bite. Ms. Lonng received bites all year long.
Commencing in 2005, petitioners sent the exterminator to Ms. Lonng’s apartment approximately once a month. Eventually Ms. Lonng and her boyfriend hired their own exterminator. Ms. Lonng continued to have bedbugs in her apartment in 2006 and through 2007. Respondents put into evidence some 50 zip-lock bags full of dead bedbugs that Ms. Lonng had collected *180 from her apartment, the bags were dated to indicate the time frame when the sample was collected.
Ms. Lonng is familiar with the subject premises, and has visited respondents there on at least 20 occasions, but she never observed any live bedbugs in the subject premises.
The next witness presented by respondents was the exterminator, Robert Rinaldi. The exterminator has been in business for 25 years, and is licensed and certified. The exterminator has provided services in the subject building for over 20 years.
The exterminator never found any bedbugs in the subject premises. The standard procedure employed by the exterminator is to inspect for bedbugs and provide treatment even if bugs were not found, provided there was other evidence of their presence. The exterminator testified that the subject premises was the only apartment in the building that he had ever treated for bedbugs.
The exterminator stated that there has been a resurgence in bedbug infestations in New York City in the last 10 to 15 years, and that prior to that he received no calls for extermination of bedbugs. The exterminator has treated between 50 to 100 apartments for bedbugs in the last 15 years, and the length of treatment varies greatly. Generally, at least three service calls would be required for treatment, but the treatment period could extend as long as over a one-year period or more. The exterminator acknowledged that he had treated the subject premises for over a year, but noted that some people request ongoing treatment because they fear reinfestation.
The exterminator never saw any live or dead bedbugs in the subject premises except the specimens that Mr. Green had shown him, which Mr. Green exhibited in a ziplock bag. The exterminator never saw any bedbug infestation in the subject premises. The exterminator believed respondents may have brought the bedbugs into the subject premises from their previous apartment.
Testimony of Jeff Eisenberg
In rebuttal, petitioners called Jeff Eisenberg from Pestaway Exterminators (Eisenberg) as an expert witness. Eisenberg is the principal of Pestaway, and holds a variety of licenses in several states related to extermination. Eisenberg’s company was among the first to identify the bedbug problem in the city.
Eisenberg testified that unlike other insects commonly found in New York City apartments, bedbug infestation did not vary *181 seasonally, and that individuals could be subjected to bites at anytime of the year. Seasonal variations in bites would be more typical of mosquitoes or bird mites.
Eisenberg testified that where there was a bedbug infestation, if three weeks had passed without an individual being bitten, the bedbug problem had resolved itself. Subsequent bites would indicate a new infestation. Ninety percent of men don’t manifest bedbug bites, and women are more commonly bitten because of their higher body temperatures.
Both Eisenberg and the exterminator identified the specimens in exhibits DI and D2 as containing at least some bedbugs. Eisenberg’s company performed an inspection in the subject premises on or about July 23, 2007. No bedbugs were found in the subject premises, but droppings were found under the mattress.
Eisenberg did not believe that the bites photographed in exhibits Cl through C3 were bedbug bites. Exhibit Cl showed just one individual bite, which was more likely to be from a mosquito. Bedbugs generally bite in a series of two or three bites. Exhibit C2 shows a bite on a foot, which is not a common area for bedbugs due to insufficient blood in that area of the body. Eisenberg stated that exhibit C2 appeared to depict a skin rash. Exhibit C3 depicts an insect bite on an eye, which Eisenberg stated would not be common for a crawling insect, and was much more likely to be from a mosquito.
Eisenberg testified that sometimes, after experiencing a problem with bedbugs, people develop “bedbug paranoia,” and insist on continuous treatment, despite lack of evidence of ongoing infestation.
Discussion
Real Property Law § 235-b (1) provides that in all residential lease agreements the landlord warrants that the premises leased are “fit for human habitation” and that occupants “shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety.” “[T]he statute places an unqualified obligation on the landlord to keep the premises habitable” throughout the term of the lease, and this obligation may not be waived or delegated (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 327 [1995]). It has been well established that insect infestation is a condition which is considered to adversely impact upon the health and safety of the occupants of a residential premises (id.).
*182 The court finds that the evidence at trial establishes that, at least to some extent, there were bedbugs in the subject premises at some point between September 2005 and January of 2007.
The court further finds that the evidence suggests that the bedbugs were introduced into the subject premises, through no fault of the petitioners, and in all likelihood by the respondents themselves. This conclusion is supported by the following facts: When the respondents moved into the subject premises there were no bedbugs in the premises for at least one year; no other tenant in the subject building made a single complaint about bedbugs during the entire period in which respondents alleged the subject premises were infested with bedbugs; no violations for bedbugs were placed at any point for any apartment in the subject building, including the subject premises, during the relevant period; respondents admit that they suffered a bedbug infestation in the apartment they lived in, immediately prior to moving into the subject premises; and respondents acknowledge they travel for work-related purposes on a regular basis.
The court rejects respondents’ argument that the bedbugs came from the neighboring building into the subject premises as not supported by the credible evidence offered at trial. The court also rejects petitioners’ legal argument that a finding that respondents are likely to have introduced the bedbugs into the subject premises excuses petitioners from liability under Real Property Law § 235-b. Section 235-b (1) provides, in pertinent part, “[w]hen any such condition has been caused by the misconduct of the tenant or lessee or persons under his direction or control, it shall not constitute a breach of such covenants or warranties.”
Petitioners did not establish at trial that the presence of bedbugs was caused by any “misconduct” by respondents. As one commentator has noted:
“The world is not only a smaller place for humans, it has become increasingly smaller for bedbugs as well. These opportunistic parasites are known as proficient hitchhikers. They travel from one place to another in luggage and clothing, jumping off at homes and hotels. What is worse is that these resilient pests have been known to survive 500 days without feeding.”[2]
*183 There is nothing in the record to suggest that any deliberate or intentional act was done by respondents which led to the presence of bedbugs in the subject premises, or even that respondents were negligent in any manner. It appears that any individual venturing out into the world today, particularly an individual who travels, risks bringing bedbugs back home.
Petitioners’ argument that it has no liability for the bedbugs in the premises is based in part on the recent DHCR ruling in Matter of 91-31/04 195th St. LLC (docket No. WD110043RO). In that case, the tenant had complained about bedbugs and the owner had responded by providing the apartment with extermination services on three occasions. After extermination services were provided, the tenant filed a decrease in services complaint alleging that the apartment remained infested with bedbugs. An on-site inspection ordered by DHCR found “evidence of bedbug infestation in a mattress” and dead bedbugs in the bedroom. The on-site inspection found no evidence of a bedbug infestation in the walls, floors, cabinets, closets and entrance of the apartment. DHCR held that the finding of dead bedbugs by the inspector supported the conclusion that the owner’s extermination service was effective, and that the owner could not be held responsible for “an infestation problem that exists solely in the personal property of the tenant’s household” (id.).
However the standard for a decrease in services complaint with DHCR, which is governed in part by Rent Stabilization Code (9 NYCRR) § 2523.4, is not the same as the standard for a claim made pursuant to Real Property Law § 235-b, which essentially makes petitioners strictly liable for conditions in the premises, and responsible for taking reasonable action to eliminate the condition.
Thus the court finds that the presence of bedbugs in the subject premises did constitute a breach of the warranty of habitability. The more difficult determination is what, if any, damages respondents are entitled to as a result of said breach. Once a breach has been established the “parties must come forward with evidence concerning the extensiveness of the breach, the manner in which it impacted upon the health, safety or welfare of the tenants and the measures taken by the landlord to alleviate the violation” (Park W. Mgt. Corp. v Mitchell at 328).
*184 In this case, there is almost no evidence of the presence of bedbugs, let alone the extent of any “infestation” apart from the testimony of the respondents. Notably, although the respondents testified that they had made complaints to HPD on at least four occasions, there was never a single violation placed on the subject premises for bedbugs. Ms. Lonng, who was readily familiar with bedbugs from her own experience, visited the subject premises on at least 20 occasions, and never saw a bedbug. The exterminator who went to the subject premises regularly during the relevant period, sometimes on a weekly basis, never saw a single live bedbug on any visit to the subject premises. The only bedbugs anyone saw at the subject premises were in ziplock bags, which respondents had collected, and which were exhibited by respondents to the exterminator or Ms. Lonng. Over the three-year period the infestation allegedly took place, respondents collected approximately 12 bedbugs.
The court would have expected a three-year unabated bedbug infestation to result in evidence similar to that which Ms. Lonng presented regarding her infestation, notably, violations from HPD, extensive evidence regarding the appearance of bedbugs and confirmation of the presence of live bedbugs by some evidence other than the testimony of respondents. Other corroborating evidence could have been photographs of stained sheets, or photographs exhibiting the typical bedbug bites in groups of three.
The court finds that the testimony of the respondents in this proceeding was not reliable and not consistent with other evidence in the record. For example, the photographs that were offered into evidence, which respondents alleged depicted bedbug bites, do not appear to have been bedbug bites at all, pursuant to the expert testimony of Eisenberg. Similarly, the testimony that the unabated infestation varied seasonally, was not supported by Eisenberg’s testimony that bedbug infestation does not vary seasonally. Moreover, respondents stated that there were periods of time when there were no bites or bedbug activity, but Eisenberg testified that a period of three weeks without a bite would indicate that the infestation has resolved itself, and subsequent bites thereafter would indicate a new infestation.
Moreover, it is not clear to the court in what manner petitioners’ response to the complaints was deficient. Petitioners made their exterminator available to respondents whenever respon *185 dents desired his services. Respondents acknowledged that they took no action beyond what petitioners had done regarding extermination services. Ms. Shapiro testified because she did not believe that hiring a different exterminator would help. What then should the petitioners have done?
The court finds it not credible that tenants would suffer for three years with an unabated bedbug infestation, believing that petitioners’ exterminator was inefficient, and take no action on their own, to alleviate the problem. Similar to what Ms. Lonng had testified she had done, the court would expect that a tenant might hire his or her own exterminator, if he or she believed petitioners’ exterminator was unqualified. Respondents never did.
Moreover, it seems unlikely to the court that an unabated bedbug infestation in the subject premises would not spread, at any point during the three years, to other parts of the subject building. Thus, while the court credits respondents’ testimony to the extent that the court finds bedbugs were present to some extent during the period, the court does not credit respondents’ testimony regarding the length and the extent of the alleged infestation. The court finds that respondents’ burden to establish the extent of the condition has not been met, and limits the court in awarding damages to respondents.
The court finds that the period for which respondents are entitled to an abatement covers September 2005 through December 2006. The first documented notification to petitioners regarding the alleged condition was in September 2005. That was the first documented phone call to the exterminator, and respondents withheld their rent in September and October of 2005. Based on the log of bites that was kept by respondents for January 2007 forward, the court finds respondents failed to establish the presence of bedbugs from January 2007 forward, and that the bites documented were in all likelihood other insect bites.
Based on the foregoing, the court finds that respondents are entitled to a twelve percent abatement in rent, for the period of September 2005 through December 2006 totaling $2,724.21. Given the parties’ stipulation that there was $5,665.84 due at the conclusion of the trial, that leaves $2,941.63 remaining due, in unpaid rent, through January 2009. Respondents’ counterclaim for property damage is severed without prejudice to its assertion in a plenary action.
*186 The court finds that neither party is the prevailing party entitled to legal fees.
Petitioners are entitled to a final judgment in the amount of $2,941.63. Issuance of the warrant is stayed five days for payment.

. An application was made that the motions be referred to Judge Wendt, who had been transferred to Kings County, at the time the motions were noticed to be heard. Judge Wendt exercised his discretion to decline referral.

. (Wenk and Shafer, Good Night, Sleep Tight, Don’t Let the Cimex Lectularis Bite, NYLJ, Jan. 26, 2006, at 4, col 4.) The same article states that one *183 female is sufficient to lead a local infestation, and that a well-fed female can lay up to 500 eggs in a lifetime, which eggs hatch between 6 and 28 days.